

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **No. 1:09cr238** |
| | ) | |
| SEAN MASCIANDARO | ) | |

## MEMORANDUM OPINION

Appellant, Sean Masciandaro, seeks reversal of his conviction by a United States Magistrate

Judge of possession of a loaded weapon in a motor vehicle in a National Park, in violation of 36

C.F.R. § 2.4(b) (2007) and 16 U.S.C. § 3. Specifically, Masciandaro argues

   (i)     that the Magistrate Judge erred by applying the regulation in force at the time
of the offense conduct, rather than the later-amended regulation in force at the
time of trial and sentencing;

   (ii)    that the Magistrate Judge erred in rejecting Masciandaro's as-applied and
facial Second Amendment challenges to the regulation, in light of the
Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. ___,
128 S. Ct. 2783 (2008); and

   (iii)   that the Magistrate Judge erred in rejecting Masciandaro's post-sentencing
request for expungement of his conviction.

For the reasons that follow, these arguments fail and the judgment of conviction must be affirmed.

### I.

On the morning of June 5, 2008, United States Park Police ("USPP") Sergeant Kenneth

Fornshill was on patrol duty in the area surrounding Daingerfield Island, a National Park Service

("NPS") property located appurtenant to and east of the George Washington Memorial Parkway in

Northern Virginia.[1] At approximately 10:00 a.m., Sergeant Fornshill, who was in a marked patrol car, entered the Daingerfield Island gravel parking lot and observed an illegally parked Toyota hatchback.[2] After parking next to the vehicle and exiting his patrol car, Sergeant Fornshill approached the Toyota and noticed two individuals asleep inside, namely (i) a man, later identified to be Masciandaro, who was asleep in the driver's seat; and (ii) a woman, later identified to be Masciandaro's girlfriend, asleep in the front passenger seat. Sergeant Fornshill then awakened Masciandaro and the passenger by tapping on the driver's side window and asked Masciandaro, the owner of the vehicle, to produce his driver's license. Masciandaro reached behind the reclined passenger seat and pulled a latch on the back seat, giving him access to the vehicle's trunk. He then retrieved a messenger bag from the trunk and placed it on the back seat, which was obscured by the vehicle's tinted rear windows. After removing his wallet from the bag, Masciandaro, who had remained in the driver's seat, produced his Virginia driver's license.

As Masciandaro was retrieving his driver's license, Sergeant Fornshill observed a large knife in plain view protruding from under the vehicle's driver's seat. This observation prompted Sergeant Fornshill to direct Masciandaro to step out of the vehicle, and to inquire of Masciandaro whether there were other weapons in the vehicle. In response, Masciandaro said that he had a loaded handgun in the messenger bag from which he had obtained his wallet. Sergeant Fornshill then handcuffed both Masciandaro and the female passenger. After a second officer arrived, Sergeant Fornshill searched the vehicle and discovered Masciandaro's Kahr P9 9mm semiautomatic handgun in a gun case inside

---

[1] Daingerfield Island, which is not an island, is located due south of Ronald Reagan National Airport and due north of Old Town Alexandria, Virginia.

[2] More specifically, the Toyota was improperly parked parallel to the edge of the parking lot in an area clearly marked as front-end parking only.

the messenger bag. Sergeant Fornshill confirmed that the firearm was loaded; six rounds of ammunition were in the weapon's magazine and a seventh was in the weapon's chamber. Sergeant Fornshill then arrested Masciandaro on two charges: (i) unlawful possession of a loaded firearm in a motor vehicle on NPS land, in violation of § 2.4(b); and (ii) failure to comply with a traffic control device, in violation of 36 C.F.R. § 4.12 (2007). Masciandaro was then taken to the nearby USPP station, where he produced an expired Virginia concealed-carry permit and was processed and released pending trial.

Prior to trial before a United States Magistrate Judge, Masciandaro filed two motions to dismiss the firearm charge, arguing (i) that § 2.4 had been amended after his arrest to provide an exception decriminalizing his offense conduct; and (ii) that § 2.4(b), as it existed at the time of the offense conduct, is unconstitutional under the Second Amendment, both facially and as applied to him. On January 14, 2009, Masciandaro appeared, with counsel, before the Magistrate Judge for trial and a hearing on his motions to dismiss. The Magistrate Judge received evidence and heard the live testimony of Masciandaro and Sergeant Fornshill. Following oral argument, the Magistrate Judge took the case under advisement.

Thereafter, on February 3, 2009, the Magistrate Judge issued an Order denying Masciandaro's motions to dismiss and finding him guilty of both the traffic violation and firearm charge. In an accompanying Memorandum Opinion setting forth the reasons for denying the motions to dismiss, the Magistrate Judge ruled (i) that because Masciandaro must be adjudicated under the regulation in force at the time of his offense conduct, and not the subsequently amended regulation, any exception set forth in a post-offense amendment to § 2.4 is inapplicable; and (ii) that § 2.4(b), both facially and as applied to Masciandaro, does not violate the Second Amendment right to keep

-3-

and bear arms as that right was interpreted by the Supreme Court in *Heller*.[3] Thereafter, on March 10, 2009, Masciandaro appeared for sentencing, and the Magistrate Judge imposed a $50 fine on the § 4.12 sign violation and a $150 fine and a $10 special assessment on the § 2.4(b) firearm violation. Following imposition of sentence, Masciandaro orally moved for expungement of the firearm conviction, arguing that "extenuating circumstances, including the fact that the regulation has changed," warranted exercise of the Magistrate Judge's equitable expungement power. Sentencing Tr. 4. The Magistrate Judge denied the request, noting that:

> I understand what you are saying. I don't think I can get into that business. I think that the rules are clear here, that the law is clear here and that it still applies. And I took that into consideration, frankly, I think, in the fine. But I don't feel that's appropriate given the case law. So, I am sorry, that is denied.

*Id.* at 4–5.

On March 24, 2009, Masciandaro filed a timely notice of appeal of the firearm conviction, pursuant to Rule 58(g)(2)(B), Fed. R. Crim. P. Following an order granting the parties' joint motion for an extension of time, Masciandaro filed his opening brief on June 19, 2009, arguing (i) that the Magistrate Judge erred in denying Masciandaro's request to apply the amended version of § 2.4 in force at the time of trial and sentencing; (ii) that the Magistrate Judge erred in denying Masciandaro's as-applied and facial Second Amendment challenges to § 2.4(b)'s prohibition on loaded weapons in motor vehicles on National Park land; and (iii) that the Magistrate Judge erred in refusing to exercise jurisdiction over Masciandaro's post-sentencing expungement request. On

---

[3] In the course of the January 14 oral argument, Masciandaro also moved orally to dismiss the firearm charge on the ground that the government failed to prove, as he contends was required, that the firearm was operable at the time of the arrest. The Magistrate Judge denied this motion in the February 3 Opinion, ruling that neither the regulation, nor the definition of "weapon" set forth in 36 C.F.R. § 1.4 (2007), required such a showing. Masciandaro has not appealed that ruling here.

July 31, 2009, the parties appeared, by counsel, for oral argument. By Order issued that same day, the appeal was taken under advisement, and the parties were directed to submit supplemental briefs. The parties complied, and Masciandaro's appeal is now ripe for disposition.

## II.

Jurisdiction over Masciandaro's appeal derives from 18 U.S.C. § 3402, and original jurisdiction below was proper under 18 U.S.C. § 3401(a). Importantly, "[a]n appellate review conducted by a district court after a bench trial before a magistrate judge is not a trial *de novo*; rather, the district court utilizes the same standards of review applied by a court of appeals in assessing a district court conviction." *United States v. Bursey*, 416 F.3d 301, 305 (4th Cir. 2005) (citing Rule 58(g)(2)(D), Fed. R. Crim. P.); *see also United States v. Steinert*, 470 F. Supp. 2d 627, 630 (E.D. Va. 2007) (same). With respect to Masciandaro's first two arguments, which were preserved below and raise purely legal issues regarding the denial of his motions to dismiss, review is *de novo. See Bursey*, 416 F.3d at 306. Review of the Magistrate Judge's denial of Masciandaro's post-sentencing expungement request is for abuse of discretion. *See Hodge v. Jones*, 31 F.3d 157, 166 (4th Cir. 1994) (noting that "[e]xpunction . . . is a discretionary function of the court, rarely utilized absent extreme circumstances").

## III.

Masciandaro's appeal presents three questions. First, it is necessary to determine whether Masciandaro was entitled to the benefit of an exception set forth in an amended regulation in effect at the time of trial and sentencing but not at the time of the offense conduct. Second, assuming the Magistrate Judge correctly held that only the regulation in force at the time of the offense conduct controls, it is next necessary to determine whether that regulation, either as applied to Masciandaro's

offense conduct, or on its face is unconstitutional under the Second Amendment. And finally, assuming that Masciandaro was constitutionally convicted under the appropriate regulation, it is necessary to determine whether the Magistrate Judge's rejection of Masciandaro's post-sentencing expungement request constituted an abuse of discretion.

Each of these questions is separately addressed.

A.      **Applicable Regulation**

Masciandaro's first argument, distilled to its essence, is that he was entitled to the benefit of an exception to § 2.4(b)'s general prohibition on possession of loaded weapons in motor vehicles on National Park land, which exception was not in force at the time of his offense conduct. In this regard, Masciandaro was convicted of violating § 2.4(b), which prohibits "[c]arrying or possessing a loaded weapon in a motor vehicle, vessel or other mode of transportation" on National Park land.[4] The exception Masciandaro contends should have been applied at his trial is set forth in 36 C.F.R. § 2.4(h) (2008), which went into effect on January 9, 2009, and was in force at the time of Masciandaro's trial and sentencing. That exception provides that

> [n]otwithstanding any other provision in this Chapter [providing for NPS regulations], a person may possess, carry, and transport concealed, loaded, and operable firearms within a national park area in accordance with the laws of the state in which the national park area, or that portion thereof, is located, except as otherwise prohibited by applicable Federal law.

§ 2.4(h). Masciandaro argues that because he was not in violation of the applicable Virginia firearm regulations at the time of his arrest, the exception set forth in § 2.4(h) decriminalizes his conduct.

Masciandaro's arguments in this regard fail, however, as it is clear that with respect to federal

---

[4] Section 2.4(b) includes an exception, not applicable here, for nonmoving vehicles being used as shooting platforms.

-6-

criminal regulations promulgated under federal enabling statutes, the regulation in effect at the time of the alleged offense conduct applies absent an express retroactivity statement to the contrary in the regulation's amendment or its enabling statute. The Supreme Court essentially disposed of this issue more than sixty-five years ago in *United States v. Hark*, 320 U.S. 531 (1944). There, the Supreme Court held that "revocation of [a] regulation d[oes] not prevent indictment and conviction for violation of its provisions at a time when it remained in force" because "[r]evocation of [a criminal] regulation does not repeal the [regulation's enabling] statute." *Id.* at 536. This follows from the fact that although a "regulation calls the [enabling statute's] statutory penalties into play, the statute, not the regulation, creates the offense and imposes punishment for its violation." *Id.* Here, § 2.4(b)'s enabling statute, 16 U.S.C. § 3, did not change between Masciandaro's offense conduct and the time of his trial. Nor does that enabling statute or § 2.4(b) contain any express retroactivity statement excepting the regulation at issue from the rule set forth in *Hark*. Accordingly, Masciandaro was not entitled to the benefit of § 2.4(h)'s amendment to § 2.4(b).

This result is both sensible and fair, as Masciandaro's conduct was clearly proscribed at the time he engaged in it.[5] Of course, it would be neither fair, nor constitutional to apply a regulation or statute that changed *after* a defendant's alleged offense conduct to establish a more *stringent*

---

[5] In this respect, it is worth noting that the general federal savings statute, 1 U.S.C. § 109, provides that repeal of a federal criminal *statute* (or partial repeal by amendment) does not preclude prosecution under the prior statute for offense conduct occurring before the statutory change, absent an express retroactivity statement to the contrary. Section 109 reversed the common-law rule, which required application of a statute as it existed at the time of trial, rather than the version existing at the time of the offense conduct. *Hark*, which issued prior to the enactment of § 109, essentially anticipates § 109's reversal of the common-law rule and applies § 109's underlying principle to regulations. *See Allen v. Grand Cent. Aircraft Co.*, 347 U.S. 535, 554–55 (1954). Indeed, there is no reason in principle to treat a statute and a regulation promulgated pursuant to a statute disparately in this regard.

standard. *See Collins v. Youngblood*, 497 U.S. 37, 42 (1990) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70 (1925)). In addition, where, as here, a regulation is amended to become more *lenient* after a defendant's alleged offense conduct, the government is free to elect not to prosecute or to prosecute under the new, more lenient standard. Masciandaro's argument that he is *entitled* to such leniency, however, is precluded by *Hark*'s clear holding.[6] Accordingly, the Magistrate Judge's application of the regulation in effect at the time of Masciandaro's offense conduct must be affirmed.[7]

---

[6] It is worth noting that application of the amended regulation might be problematic, as nine days after Masciandaro's sentencing, a D.C. federal district court issued a preliminary injunction against application of § 2.4(h). *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009). Just over two months later, Congress passed, and the President signed, a statute codifying the since-enjoined exception. *See* Pub. L. No. 111–49, Title V, § 512, 123 Stat. 1735, 1764 (May 22, 2009) (codified at 16 U.S.C. § 1a–7b) (effective February 22, 2010). Thus, Masciandaro's argument, if accepted, would lead to application of different statutory or regulatory provisions based on whether he went to trial (i) before January 9, 2009; (ii) between January 9, 2009, and March 19, 2009; (iii) between March 19, 2009, and February 22, 2010; and (iv) after February 22, 2010. *Hark* and the operation of § 109 sensibly avoid this anomaly.

[7] Even assuming, *arguendo*, that Masciandaro had been entitled to § 2.4(h)'s exception, it is not at all clear that his conduct was in compliance with the applicable Virginia statute, Va. Code § 18.2-308(A), which prohibits carrying a concealed firearm "about [the] person" without a permit. To the contrary, a brief review of Virginia case law suggests that Masciandaro, whose concealed-carry permit had expired, carried the firearm at issue in this case "about his person" and in a concealed manner when he held the messenger bag (in which the firearm was hidden) in the backseat of his vehicle. *See, e.g.*, *Schaaf v. Commonwealth*, 220 Va. 429, 432 (1979) (concealed firearm carried in a handbag is "about the person"); *Leith v. Commonwealth*, 17 Va. App. 620, 621–22 (1994) (concealed firearm located in locked console of automobile is "about the person" because it is "close to the carrier" and "readily accessible"). The cases relied on by Masciandaro in this regard appear either to be factually distinguishable or to have been overruled. *See, e.g.*, *Pruitt v. Commonwealth*, 274 Va. 382, 389 (2007) (firearm placed by defendant between front seats of vehicle as he exited following an accident was not "about his person" because "once [defendant] exited the vehicle and closed the door, the [firearm] was no longer accessible to him so as to afford 'prompt and immediate use'"); *Sutherland v. Commonwealth*, 109 Va. 834 (1909) (holding that a firearm "in a scabbard and in a pair of saddlebags" is not "readily accessible for use or surprise if desired"), *overruled in part by Schaaf*, 220 Va. at 431, 432 (observing that "*Sutherland* was decided seventy years ago, and it is doubtful that this court in 1909 envisioned the modern day handbag" and holding application of *Sutherland* to such situations "would render [§ 18.2-308(A)] useless"). In any event, the Magistrate Judge explicitly declined to address this issue at trial, holding that § 2.4(h)'s

**B.    Second Amendment Challenge**

Masciandaro next argues that the Magistrate Judge erred in denying his as-applied and facial Second Amendment challenges. More specifically, Masciandaro contends (i) that application of § 2.4(b) to him violates his Second Amendment right to keep and bear arms, as that right was announced by the Supreme Court in *Heller*; and (ii) that even assuming his as-applied challenge fails, § 2.4(b) is unconstitutionally overbroad on its face. Where, as here, a party brings both as-applied and facial constitutional challenges, it is appropriate to determine first whether the law is constitutional as applied to the challenging party's conduct, and then only if the as-applied challenge fails, to determine whether it is necessary to consider the facial challenge. This is so "for reasons relating both to the proper functioning of courts and to their efficiency," as addressing facial challenges unnecessarily "would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502–04 (1985). In addition, "the overbreadth question is ordinarily more difficult to resolve than the as-applied, since it requires . . . consideration of many more applications than those immediately before the court." *Fox*, 492 U.S. at 485 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).[8] Thus, Masciandaro's as-applied challenge is addressed first. Before doing so, however, it is

_____

exception did not apply. Because that ruling is affirmed here, it is unnecessary to reach or decide whether Masciandaro would qualify for the § 2.4(h) exception.

[8] Indeed, in *Fox*, the Supreme Court remanded the case, first for a "determination, pursuant to the standards described above, of the validity of [the] law's application" to the particular plaintiffs "and, [only] if its application . . . is found to be valid, for determination whether [the law's] substantial overbreadth nonetheless makes it unenforceable." 492 U.S. at 486.

necessary to summarize briefly *Heller*'s narrow holding and *dicta*, in which the Supreme Court—for the first time—held that the Second Amendment protects an individual's right to keep and bear arms in certain circumstances.

### (1)    Heller's Holding

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Just over a year ago, the Supreme Court in *Heller* interpreted this language to "guarantee [an] individual right to possess and carry weapons in case of confrontation." 128 S. Ct. at 2797. Of course, *Heller*'s holding was much narrower. More specifically, the Supreme Court in *Heller* addressed three District of Columbia weapons laws, which taken together "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* at 2817.[9] Importantly, *Heller* involved an as-applied challenge to these provisions by a D.C. special police officer who sought an injunction ordering the District of Columbia to issue him a license to carry his handgun, operable and free of a trigger lock, in his home. In finding that the officer was entitled to the relief sought, the Supreme Court summarized its holding as follows:

> In sum, we hold that the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense. Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it *in the home.*

*Id.* at 2821–22 (emphasis added). Thus, *Heller*'s narrow holding is explicitly limited to vindicating

---

[9] In describing the provisions at issue, *Heller* observed that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." 128 S. Ct. at 2818.

the Second Amendment "right of law-abiding, responsible citizens to use arms in defense *of hearth and home.*" *Id.* at 2821 (emphasis added).

Interestingly, *Heller* does not squarely address or decide the appropriate level of scrutiny to be applied to statutes and regulations subjected to Second Amendment challenges. Justice Scalia's majority opinion sidesteps this issue, noting that it is preferable to address it in the future on a case-by-case basis. *See Heller*, 128 S. Ct. at 2821. *Heller* itself suggests that some elevated level of scrutiny—either strict scrutiny or some intermediate level of scrutiny—is appropriate, and the D.C. laws at issue in *Heller* failed under any such standard. *Id.* at 2817–18 and n.27. Those lower courts to address Second Amendment challenges to statutes and regulations post-*Heller* have not been uniform in this respect; some have applied strict scrutiny,[10] others have used intermediate scrutiny,[11] and still others have formulated an "undue burden"-type approach similar to that used in the context of abortion regulations.[12] In any event, it is reasonable to conclude from *Heller* that some elevated level of scrutiny is required when assessing the Second Amendment constitutionality of statutes and regulations.

---

[10] *See, e.g., United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231–35 (D. Utah 2009) (applying strict scrutiny and upholding 18 U.S.C. § 922(g)(9), which prohibits individuals convicted of domestic violence crimes from possessing firearms).

[11] *See, e.g., United States v. Miller*, 604 F. Supp. 2d 1162, 1171–72 (W.D. Tenn. 2009) (applying intermediate scrutiny and upholding federal felon-in-possession statute, 18 U.S.C. § 922(g)); *United States v. Bledsoe*, No. SA-08-CR-13(2)-XR, 2008 WL 3538717, at *4 (W.D. Tex. Aug. 8, 2008) (unpublished) (applying intermediate scrutiny and upholding 18 U.S.C. § 922(a)(6), which places age restrictions on firearm purchases).

[12] *See, e.g., Nordyke v. King*, 563 F.3d 439, 460 (9th Cir. 2009) (ordinance prohibiting firearm possession on county property did "not meaningfully impede the ability of individuals to defend themselves in their homes with usable firearms, the core of the right as *Heller* analyzed it"); *People v. Flores*, 169 Cal. App. 4th 568, 577 (2008) (statute prohibiting carrying of loaded firearms in public did "not burden the core Second Amendment right announced in *Heller*").

(2)    *Heller's Dicta*

Because *Heller* also "represents [the Supreme] Court's first in-depth examination of the

Second Amendment," Justice Scalia's majority opinion provides some guidance, in *dicta*, for future

courts evaluating Second Amendment claims. *Id.* at 2821. In this regard, *Heller's dicta* is notable

for the degree to which it confirms the limited scope of the case's holding. For example, the majority

opinion emphasizes that "[l]ike most rights, the right secured by the Second Amendment is not

unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever

and for whatever purpose." *Id.* at 2816. Thus, *Heller* recognizes (with approval) that "the majority

of 19th-century courts to consider the question held that prohibitions on carrying concealed weapons

were lawful under the Second Amendment or state analogues." *Id.* In addition, the majority opinion

cautions that

> [a]lthough we do not undertake an exhaustive historical analysis today of the full
> scope of the Second Amendment, nothing in our opinion should be taken to cast
> doubt on longstanding *prohibitions* on the possession of firearms by felons and the
> mentally ill, or laws *forbidding* the carrying of firearms in sensitive places such as
> schools and government buildings, or laws imposing conditions and qualifications
> on the commercial sale of arms.

*Id.* at 2816–17 (emphasis added). Moreover, *Heller* "identif[ied] these presumptively lawful

regulatory measures only as examples" that did "not purport to be exhaustive." *Id.* at 2817 n.26.

Accordingly, although *Heller* does not *preclude* Second Amendment challenges to laws regulating

firearm possession outside the home,[13] *Heller's dicta* makes pellucidly clear that the Supreme

---

[13] To be sure, in rejecting the District of Columbia's argument that the Second Amendment
provided only a collective right connected to militia service, *Heller* relied on at least two 19th-
century state supreme court cases interpreting the Second Amendment as protecting an individual
right to carry weapons openly (but not concealed) in public. More specifically, *Heller* cited
approvingly to *Nunn v. State*, 1 Ga. 243 (1846), in which "the Georgia Supreme Court construed the
Second Amendment as protecting the '*natural* right of self-defence' and therefore struck down a ban

-12-

Court's holding should not be read by lower courts as an invitation to invalidate the existing universe of public weapons regulations.[14] With these as guiding principles, the analysis turns to Masciandaro's as-applied challenge.

  *(3) As-Applied Challenge*

  With respect to Masciandaro's as-applied challenge, the analysis properly begins with § 2.4(b)'s elements. This is so because where, as here, a defendant is convicted of a "general" charge that is "framed in the words of the statute," a constitutional challenge to that conviction must focus on the statute's elements, as "[c]onviction upon a charge not made would be sheer denial of due process." *Thornhill v. Alabama*, 310 U.S. 88, 96 (1940) (quoting *De Jonge v. Oregon*, 299 U.S. 353, 362 (1937)).[15] Here, 2.4(b) required the government to prove essentially three elements, namely (i) that Masciandaro "carr[ied] or possess[ed] a loaded weapon"; (ii) that he did so "in a motor vehicle";

---

on carrying pistols openly." *Heller*, 128 S. Ct. at 2809 (quoting *Nunn*, 1 Ga. at 251). The *Heller* majority described *Nunn* as "perfectly captur[ing] the way in which the operative clause of the Second Amendment furthers" the Amendment's purpose. *Id.* Similarly, *Heller's dicta* also cited with approval to *State v. Chandler*, 5 La. Ann. 489 (1850), in which "the Louisiana Supreme Court held that citizens had a right to carry arms openly" under the Second Amendment. *Heller*, 128 S. Ct. at 2809 (citing *Chandler*, 5 La. Ann. at 490). Of course, like *Heller*, these 19th-century state supreme court decisions were silent on the constitutionality of the narrower regulation at issue here: a prohibition on carrying or possessing loaded weapons in motor vehicles on National Park land.

  [14] In this regard, at least one commentator has observed that *Heller's* list of presumptively lawful regulatory measures "is a crucial cue to lower court judges that is likely to minimize greatly the *Heller* decision's impact." A. Rostron, *Protecting Gun Rights and Improving Gun Control after District of Columbia v. Heller*, 13 Lewis & Clark L. Rev. 383, 394 (2009). Thus, "[r]ather than being a win for the 'pro-gun' side or a setback for the 'anti-gun' forces, [*Heller*] may turn out simply to have been a victory for all Americans, having finally driven home to everyone that respecting gun rights and achieving sound gun control are not mutually exclusive endeavors." *Id.* at 418.

  [15] *See also Dunn v. United States*, 442 U.S. 100, 106–107 (1979) ("To uphold a conviction on a charge that was neither alleged in the indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.")

-13-

and (iii) that he did so on National Park land. § 2.4(b). Thus, the question presented is whether Masciandaro's conviction based on conduct satisfying these elements violates his Second Amendment right to keep and bear arms, as that right was elucidated by the Supreme Court in *Heller*. Put differently, the question is whether Masciandaro has a Second Amendment right to carry a loaded firearm in his vehicle on National Park land.

As a threshold matter, it is important to observe that *Heller*'s narrow holding does not reach or decide this issue. This is so because § 2.4(b), unlike the laws at issue in *Heller*, does not prohibit possession of a loaded firearm *in the home*; rather, § 2.4(b) prohibits carrying or possessing a loaded weapon *in a motor vehicle on National Park land*.[16] Thus, it is necessary to determine whether § 2.4(b)'s application to Masciandaro's offense conduct withstands the appropriate level of elevated constitutional scrutiny—either strict scrutiny, intermediate scrutiny, or an "undue burden" analysis. In this respect, strict scrutiny requires that a statute or regulation "be narrowly tailored to serve a compelling governmental interest in order to survive" a constitutional challenge. *Abrams v. Johnson*, 521 U.S. 74, 91 (1997). Intermediate scrutiny requires that the challenged statute or regulation "be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Finally, a statute or regulation survives an "undue burden" analysis where it does not have

---

[16] In this respect, Masciandaro argued that because he often slept in his vehicle when traveling long distances, his vehicle is in effect his home. This argument is unpersuasive. First, occasionally sleeping in one's vehicle on someone else's property does not convert that vehicle into a home. And more importantly, Masciandaro himself testified at trial that he often carries numerous personal items in his vehicle precisely because he "[g]enerally . . . do[es] not] know at what point . . . [he] *will be home.*" Trial Tr. 17 (emphasis added). Thus, even Masciandaro acknowledged at trial that he sometimes slept in his vehicle because *he was away from home*, not because his vehicle *was his home*. Accordingly, Masciandaro's argument that the regulation in question violated his Second Amendment right to carry a weapon in his home must be rejected. Neither reached nor decided here is whether a person using a camper or recreational vehicle (RV) on National Park land has a Second Amendment right to carry or possess a loaded, operable firearm in the camper or RV.

the "'purpose or effect [of] plac[ing] a substantial obstacle in the path'" of the individual seeking to

engage in constitutionally protected conduct. *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007)

(quoting *Planned Parenthood of Southeastern Penn. v. Casey*, 505 U.S. 833, 878 (1992)).

These principles, applied here, compel the conclusion that under any elevated level of

constitutional scrutiny, Masciandaro's as-applied challenge must fail. First, the governmental interest

furthered by § 2.4(b)—public safety in National Parks—is both important and compelling. In

addition, § 2.4(b) is both narrowly tailored and substantially related to furthering public safety in

National Parks. In this respect, § 2.4(b) does not prohibit carrying or possessing a loaded firearm on

National Park land *outside* motor vehicles, nor does § 2.4(b) prohibit carrying or possessing

*unloaded* firearms in motor vehicles on National Park land. Rather, § 2.4(b) is limited to those

individuals, like Masciandaro, who elect to carry or possess a loaded firearm in a motor vehicle, and

who do so on National Park land. Moreover, given these limitations, it is clear that § 2.4(b) does not

have the purpose or effect of placing a substantial obstacle in the path of Masciandaro's exercise of

his Second Amendment right, as announced in *Heller*, "to use arms in defense of hearth and home."

*Heller*, 128 S. Ct. at 2821. Accordingly, because § 2.4(b) plainly withstands any elevated level of

scrutiny, Masciandaro's as-applied challenge must fail.

In addition, *Heller*'s list of "presumptively lawful regulatory measures" points persuasively

to rejection of Masciandaro's as-applied challenge. *Id.* at 2817 n.26. In this respect, *Heller*'s *dicta*

explicitly acknowledges that "laws *forbidding* the carrying of firearms *in sensitive places* such as

schools and government buildings" do not violate the Second Amendment rights of those prosecuted

under such laws. *Id.* at 2817 (emphasis added). Although *Heller* does not define "sensitive places,"

the examples given—schools and government buildings—plainly suggest that motor vehicles on

-15-

National Park land fall within any sensible definition of a "sensitive place." Schools and government buildings are sensitive places because, unlike homes, they are public properties where large numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities. Likewise, National Parks are public properties where large numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities. Moreover, the locations within National Parks *where motor vehicles travel*—roads and parking lots—are even more sensitive, as roads and parking lots are extensively regulated thoroughfares frequented by large numbers of strangers, including children. Thus, unlike a home or other private property, where the "need for defense of self, family, and property is most acute," the locations in National Parks where vehicles travel, like schools and government buildings, are sensitive places where the Second Amendment leaves the judgment of whether (and if so, how) to regulate firearms to the legislature, not the judiciary. *Id.* at 2817. Similarly, *Heller*'s approval of concealed weapons bans provides further support for rejecting Masciandaro's as-applied challenge, as carrying a loaded weapon in a motor vehicle—an act which, by definition, is almost always outside the view of those nearby—presents the sort of compelling safety risk more adequately resolved by legislation than judicial *ipse dixit*.[17]

Finally, the result reached here also finds support in the scant post-*Heller* case law addressing firearms regulations in "sensitive places." For example, in *Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009), a Ninth Circuit panel rejected a Second Amendment *Heller* challenge to a county ordinance

---

[17] *See, e.g.*, J.H. Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253, 303 (2009) (arguing that "gun control is one area where 'the answers to most of the cruel questions posed are political and not juridical.'" (quoting *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 532 (1989) (Scalia, J., concurring in part and concurring in the judgment))).

broader than the regulation at issue in this case. More specifically, *Nordyke* held that an ordinance

banning *all* possession of weapons *or ammunition* on county property "fits within the exception from

the Second Amendment for 'sensitive places' that *Heller* recognized." *Id.* at 460. This is so, the

Ninth Circuit panel explained, because county property includes many "gathering places where high

numbers of people might congregate" and, like government building and schools, "possessing

firearms in such places risks harm to great numbers of defenseless people (*e.g.*, children)." *Id.* at 460,

459. Thus, the ordinance upheld in *Nordyke* did "not meaningfully impede the ability of individuals

to defend themselves in their homes with usable firearms, the core of the right as *Heller* analyzed

it." *Id.* at 460.

The same result should obtain here for essentially similar reasons. Significantly, § 2.4(b) is

more narrowly framed than the ordinance at issue in *Nordyke*; § 2.4(b) does  not prohibit *all*

possession of firearms and ammunition on National Park land, but rather limits the prohibition at

issue to carrying or possessing *loaded* firearms *in motor vehicles*. Thus, if the county ordinance at

issue in *Nordyke* is constitutional under the Second Amendment, the constitutionality of § 2.4(b)

follows *a fortiori*.[18] Accordingly, Masciandaro's § 2.4(b) conviction, which rested on proof that he

---

[18] It is worth noting that the Ninth Circuit has since voted to rehear *Nordyke en banc*. *See* ___
F.3d ___, No. 07-15763, 2009 WL 2383875 (9th Cir. July 29, 2009) (Order). Of course, it is also
worth noting that the bulk of the panel opinion in *Nordyke* confronted an issue not present in this
case, namely whether the Second Amendment applies to state and county ordinances via Fourteenth
Amendment incorporation. In any event, the panel opinion in *Nordyke* is persuasive with respect to
its "sensitive places" analysis, and no *en banc* reconsideration of that analysis would affect the result
reached here.

In addition, the result reached here also finds support in other post-*Heller* cases upholding
weapons regulations based on both *Heller*'s "sensitive places" exception and *Heller*'s recognition
that concealed weapons bans are constitutional. *See, e.g., United States v. Davis*, 304 F. App'x 473,
474 (9th Cir. 2008) (unpublished) (upholding conviction for carrying concealed weapon in an
airplane and observing that "nothing in [*Heller*] was intended to cast doubt on the prohibition of
concealed weapons in sensitive places"); *United States v. Dorosan*, No. 08cr042, 2009 WL 273300,

possessed a *loaded* firearm *in a motor vehicle* and *on National Park land*, does not violate his Second Amendment rights.[19]

(4)     *Facial Challenge*

Next, although Masciandaro's as-applied challenge fails, it is necessary to address his facial challenge. This is so because a facial challenge generally permits a "defendant to attack a statute because of its effect on conduct other than the conduct for which defendant is being punished, thus protecting the right to engage in conduct not directly before the court." *Massachusetts v. Oakes*, 491 U.S. 576, 586 (1989) (Scalia, J., concurring) (citing *Brockett*, 472 U.S. at 503). The Supreme Court

---

at *1 (E.D. La. Jan. 28, 2009) (Mem. Op.) (affirming magistrate judge's judgment of conviction for violation of 39 C.F.R. § 232.1(1), which prohibits possession of firearms on United States Postal Service property, finding the regulation constitutional under *Heller's* "sensitive places" exception); *United States v. Walters*, No. 08cr31, 2008 WL 2740398, at *1 (D.V.I. July 15, 2008) (Order) (upholding conviction for possession of a firearm within 1,000 feet of a school zone); *People v. Yarbrough*, 169 Cal. App. 4th 303, 314 (2008) ("concealment of a firearm under . . . clothing on a residential driveway that was not closed off from the public and was populated with temporary occupants falls within the 'historical tradition' of prohibiting the carrying of dangerous weapons in publicly sensitive places" (quoting *Heller*, 128 S. Ct. at 2817)).

[19] In this respect, because proof that Masciandaro's conduct satisfied the elements of § 2.4(b) is sufficient to defeat the as-applied challenge, it is unnecessary to determine whether the Magistrate Judge could have applied a narrowing construction that would have placed the conduct for which Masciandaro was convicted even further outside the scope of his Second Amendment rights. *See, e.g., Osborne v. Ohio*, 495 U.S. 103, 125–26 (1990) (rejecting as-applied constitutional challenge based on state supreme court's narrowing construction but "remand[ing] for a new trial . . . to ensure that [defendant's] conviction stemmed from a finding that the [government] had proved each of the elements" of the offense). *But see, e.g., Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884 (1997) (observing that courts "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction" (quoting *Virginia v. Am. Bookseller's Ass'n*, 484 U.S. 383, 397 (1988))); *United States v. Reese*, 92 U.S. 214, 221 (1875) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.") Similarly, because the judgment of conviction here did not rest upon any factual findings (nor did the charging document at issue set forth any allegations) concerning the nature of Daingerfield Island, it is unnecessary to determine whether such findings may have provided further support for rejecting Masciandaro's as-applied challenge.

-18-

has recently recognized that there are generally two types of facial challenges to a law's constitutionality. First, a party ordinarily "can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the [law] would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, ___ U.S. ___, 128 S. Ct. 1184, 1190 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In addition, the Supreme Court's "cases recognize a second type of facial challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 1190 n.6 (quoting *New York v. Ferber*, 458 U.S. 747, 769–71 (1982)).[20] Thus, the analysis turns to whether Maciandaro's Second Amendment facial challenge to § 2.4(b) succeeds under either type of facial challenge.

First, it is pellucidly clear that Masciandaro has not "establish[ed] that no set of circumstances exists under which" § 2.4(b) would be valid. *Salerno*, 481 U.S. at 745. In this respect, it is important to observe as a threshold matter that because, as discussed *supra*, the Second Amendment does not grant *Masciandaro* an absolute right to carry a loaded weapon in his vehicle on National Park land in all circumstances, it necessarily follows that § 2.4(b) has at least *some* constitutional applications. And where, as here, a law has at least some constitutional applications, a facial challenge to that law ordinarily succeeds only where the challenging party demonstrates that any unconstitutional applications of the law are not "severable" as a matter of statutory construction. This "severability" inquiry "is largely a question of legislative intent, but the presumption is in favor

---

[20] *See also United States v. Booker*, 543 U.S. 220, 314 (2005) (Thomas, J., dissenting in part) ("Absent an exception such as First Amendment overbreadth, we will facially invalidate a statute only if the plaintiff establishes that the statute is invalid in all its applications.").

of severability." *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984). Thus, absent a clear showing that

the law's enacting body "would not have enacted those provisions [or applications] which are within

its power, independently of [those] which [are] not, the invalid part[s] may be dropped if what is left

is fully operative as a law." *Id.* (internal quotations omitted).[21] Masciandaro has made no such

showing. Notably, the only applications of § 2.4(b) raised by Masciandaro that are even *arguably*

unconstitutional under *Heller* are (i) application of § 2.4(b) to a person legitimately using a motor

vehicle as a home, or (ii) application of § 2.4(b) to a person who loads a firearm in a vehicle on

National Park land for immediate and articulable self-defense purposes. Yet, even assuming,

*arguendo*, that such applications might infringe on some hypothetical individual's Second

Amendment right, narrowing constructions of § 2.4(b) could easily remedy any unconstitutionality.[22]

---

[21] *See also Booker*, 543 U.S. at 323 (Thomas, J., dissenting in part) ("We presume that the unconstitutional application is severable. This presumption is a manifestation of *Salerno*'s general rule that we should not strike a statute on its face unless it is invalid in all its applications. Unless the Legislature clearly would not have enacted the constitutional applications independently of the unconstitutional application, the Court leaves the constitutional applications standing." (citing *Regan*, 468 U.S. at 653)).

[22] For example, where, unlike here, a person prosecuted under § 2.4(b) lawfully *resides* in a "vehicle" (like a motor home), a construing court could simply narrow the meaning of "motor vehicle" in § 2.4(b) to exclude vehicles actually used as homes. Similarly, in the unlikely event that a person were prosecuted for loading a weapon in circumstances presenting an imminent danger, a construing court could read a common-law "justification" defense into § 2.4(b). Although these observations do not purport to determine whether (and under what facts) such constructions would be appropriate or necessary, these observations illustrate that any unconstitutional applications of § 2.4(b) are resolvable on a case-by-case basis.

Of course, *Heller* did not read a common-law "justification" or "self-defense" exception into the D.C. law at issue in that case, instead finding that such statutory construction was foreclosed by a prior opinion of the D.C. Court of Appeals, the statute's plain text, and "the presence of certain other enumerated exceptions." *Heller*, 128 S. Ct. at 2818–19 (citing *McIntosh v. Washington*, 395 A.2d 744, 755–56 (D.C. 1978)). In this regard, it is important to note that the Supreme Court typically "defer[s] to the decisions of the courts of the District of Columbia on matters of exclusively local concern." *Whalen v. United States*, 445 U.S. 684, 687 (1980). *But see Heller*, 128 S. Ct. at 2853–54 (Breyer, J., dissenting) ("[B]ecause I see nothing in the District law that would *preclude*

Accordingly, Masciandaro has not "establish[ed] that no set of circumstances exists under which" § 2.4(b) would be constitutionally valid and hence has failed to satisfy the first type of facial challenge. *Salerno*, 481 U.S. at 745.

Similarly, Masciandaro has not demonstrated that § 2.4(b) must be struck down on its face as unconstitutionally overbroad. First, it is debatable whether the facial "overbreadth" doctrine *ever* extends beyond the First Amendment context and, if it does, whether it is applicable to Second Amendment challenges.[23] And even assuming, *arguendo*, that facial overbreadth challenges *are* permissible in the Second Amendment context,[24] it appears more doubtful still that such challenges are appropriate with respect to firearms laws *not affecting the home*.[25] In any event, it is unnecessary

---

the existence of a background common-law self-defense exception, I would avoid the constitutional question by interpreting the statute to include it."). By contrast, neither § 2.4(b)'s plain text, nor any enumerated exceptions, foreclose a common-law self-defense exception. Nor is it necessary here to consider deference to the construction of a state court, as the regulation at issue is federal, and not local, in nature.

[23] *See* Richard H. Fallon, Jr., et al., *Hart and Wechsler's The Federal Courts and the Federal System*, 194–97 (5th ed. 2003) (describing debate in Supreme Court and among scholars as to scope of overbreadth doctrine).

[24] To be sure, *Heller* likens the Second Amendment right to keep and bear arms in at least some respects to the First Amendment right to free speech, most notably in observing that "rational basis" scrutiny was not the appropriate standard of scrutiny for the D.C. regulations at issue in that case. *See Heller*, 128 S. Ct. at 2817 n.27 ("Obviously, [a rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.").

[25] In this respect, it is worth noting that *even in the First Amendment context*, overbreadth challenges are inappropriate to challenges only involving regulation of "commercial speech." *See, e.g., Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496–97 (1982) ("[O]verbreadth doctrine does not apply to commercial speech."); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 380–81 (1977) (same). Thus, given *Heller*'s focus on the home, where the Second Amendment right to keep and bear arms for self-defense is "most acute," it appears doubtful that overbreadth challenges are appropriate where, as here, a firearm limitation does not even arguably

here to decide whether (and under what circumstances) a facial overbreadth challenge may succeed on Second Amendment grounds, as Masciandaro has failed to satisfy his burden of demonstrating *"from actual fact* that a substantial number of instances exist in which" § 2.4(b) cannot be applied constitutionally. *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (emphasis added).[26] Indeed, Masciandaro's allegations of § 2.4(b)'s overbreadth are purely hypothetical and are unsupported by any showing that the alleged overbreadth is real, let alone substantial. Accordingly, Masciandaro's facial challenges must be rejected and the Magistrate Judge's ruling in that regard affirmed.

## C.   **Expungement**

Masciandaro's final argument—that the Magistrate Judge committed an abuse of discretion in refusing to exercise jurisdiction over or grant his expungement request—is patently meritless. To be sure, "courts . . . have inherent equitable power to order the expungement of criminal records[,] . . . [but] such power is of 'exceedingly narrow scope.'" *United States v. Salleh*, 863 F. Supp. 283, 283–84 (E.D. Va. 1994) (quoting *Coles v. Levine*, 561 F. Supp. 146, 153 (D. Md. 1983), *aff'd*, 725 F.2d 674 (4th Cir. 1984)). Thus, a court's equitable expungement power "is to be reserved only for extreme and compelling circumstances, such as when necessary to remedy the denial of an individual's constitutional rights, or when the government concedes the defendant's innocence." *Id.* at 284 (internal citations and quotation marks omitted).

This case presents no such circumstances. Indeed, where, as here, a conviction is

---

affect firearms in the home. *Heller*, 128 S. Ct. at 2817.

[26] *See also Wash. State Grange*, 128 S. Ct. at 1190 n.6 ("We generally do not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law.").

constitutionally valid and upheld, it is difficult to imagine circumstances warranting expungement. Thus, even assuming the Magistrate Judge had discretion to grant Masciandaro's expungement request, the record does not support Masciandaro's contention that it was an abuse of discretion not to grant the request. Rather, the Magistrate Judge found that expungement was not "appropriate given the case law" and that any extenuating circumstances were taken into account by the modest fine imposed. Sentencing Tr. 4, 5. Accordingly, Masciandaro has failed to demonstrate that the Magistrate Judge's denial of his expungement request was an abuse of discretion.

## IV.

In sum, the Magistrate Judge correctly held that Masciandaro must be adjudicated under the regulations in effect at the time of the alleged offense conduct. In addition, the Magistrate Judge correctly held that Masciandaro's as-applied and facial Second Amendment challenges are not supported by *Heller* and hence must fail. Finally, the Magistrate Judge's denial of Masciandaro's post-sentencing expungement request was not an abuse of discretion. Accordingly, Masciandaro's appeal must be dismissed and his judgment of conviction affirmed.

An appropriate Order will issue.

Alexandria, Virginia
August 26, 2009

/s/

T. S. Ellis, III
United States District Judge